# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| Ann Kent, | CV 09-0280 TUC - FRZ (JM) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| City of Tucson, a municipal corporation of the State of Arizona, | |
| Defendant. | |

Plaintiff Ann Kent ("Kent") brought this action against Defendant City of Tucson ("the City") seeking injunctive relief and compensatory damages based on alleged workplace gender discrimination. Pending before the Court is the City's Motion for Summary Judgment (Doc. 47). Kent has opposed the motion (Doc. 57), and the City has replied (Doc. 62). The matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 626(b)(1)(B) and Local Rule – Civil 72.1(b). As discussed below, the Magistrate Judge finds that the record does not support Kent's claim and therefore recommends that the City's Motion for summary judgment be granted.

**I.    Factual Background**

Kent was hired by the City on July 7, 2007, as a firefighter recruit to attend a 22 week training class at the Public Safety Academy (the "Academy"). Training at the Academy is conducted by Tucson Fire Department ("TFD") captains under the direction of a lead captain. *DSOF*, ¶ 28. The training captains are generally assigned to training for two years and teach various skills and materials required for the course. The lead captain is responsible for supervision of the day-to-day operations, time management, class and drill scheduling, and the completion of the documentation of each recruits progress through the training program.

1 | *Id*. The training captains are assisted by two firefighters who act as mentors. The role of the
2 | mentors is to guide the recruits through training to become successful firefighters. *DSOF*,
3 | ¶ 29. Although mentors may lead a class or drill when there is a shortage of captains, they
4 | do not have any supervisory role in the evaluation or discipline of the class members. *Id*.
5 | TFD assigns a male and female mentor to each training class. *DSOF*, ¶ 30.

Kent's training class at the Academy was designated as the 07-2 class. *DSOF*, ¶ 16.[1] The 07-2 class was originally comprised of 19 recruits, 16 male and three female. *DSOF*, ¶ 17. TFD's training command at the time of Kent's training class was headed by Fire Chief Dan Newburn, who was the chief executive officer of TFD responsible for hiring and firing of personnel and the oversight of the training program. *DSOF*, ¶ 20. Under Chief Newburn was Assistant Chief Jerry Bates, who was responsible for supervision of the deputy chief for training and who also provided recommendations on the hiring and firing of personnel to Chief Newburn. *Id*. During Kent's training, two Deputy Chiefs, James Critchley (through September 7, 2007) and Laura Baker (September 8, 2007 through the end of the class) were responsible for the overall on-site supervision of the administration of the training program, preparation of the training materials, supervision of the training captains and the training staff. *Id*. The lead training captain for the class was Captain Casey Justen. *DSOF*, ¶ 20. The other captains involved in the class were Captain Michael Fishback (for the first half of the class), Captain Lewis Harris, Captain Eric Perry, Captain Cody Comer, and Captain James Kearney. *Id*. The mentors for the class were Firefighter Marci Zbojniewicz and Engineer Charles Cohen. *Id*. Kent was also assigned a peer fitness counselor, Firefighter Kathleen Hancock. *DSOF*, ¶ 32.

The training program at the Academy evaluates each recruit's performance in four main areas. The first involves the review of manuals and written materials which are subject to written tests. A second involves the recruit's practical skills in the use of equipment and

---

[1]*DSOF* refers to Defendant City of Tucson's Separate Statement of Facts (Doc. 46).

duties of a firefighter, which are taught and tested through a series of drills. A third is the recruit's physical fitness which is measured during training. The fourth and final area is the recruit's attitude, including their ability to work and function in stressful situations and maintain their composure. *DSOF*, ¶ 36.

The City and TFD have established policies and procedures for evaluating firefighter recruits performance at the Academy. The training captains, who monitor each recruit's progress, administer multiple written and practical skills tests and physical strength baselines. *DSOF*, ¶ 25. Each week the training staff prepares "One Word" evaluations tracking each recruit's progress. The One Word evaluations are determined through the consensus of the captains assigned to each class and are recorded on a matrix with each recruit's name and his or her associated ratings for the previous and current week for four performance categories: academics; skills; attitude; and fitness. *DSOF*, ¶ 25 & Ex. 17. There are five rating levels for each performance category: very good (98-100%); good (95-98%); average (90-95%); fair (85-90%); and poor (<85%). *DSOF*, Ex. 17. The One Word evaluations are reviewed weekly by the Fire Chief, the Assistant Chief for Training, the Deputy Chief for Training, and the Fire Department's Human Resources Officer. *DSOF*, ¶ 25.

The training of the recruits is conducted by the TFD captains under the direction of a lead captain. The lead captain is responsible for supervision of the day-to-day operations, time management, class and drill scheduling, and the completion of the documentation of each recruit's progress through the program. *DSOF*, ¶ 28. The mentors occasionally lead practical drills when there is a shortage of training captains. Although the mentors provide comments about the recruits to the lead captain, they do not participate in the evaluation, grading, or ranking of recruits, and they do not participate in the One Word evaluations. *DSOF*, ¶ 31.

Recruits are taught practical skills in several ways. Specific skills are taught in a regimented, step-by-step order that evolves into a series of drills, call an evolution, which are comparable to the skills needed as a firefighter. Recruits are evaluated daily on each of the

3

steps of the evolution being taught and are counseled to correct deficiencies prior to testing. During this time, the training captains record the individual recruit's level of performance on daily record sheets. *DSOF*, ¶ 38. Following training and review on the steps for each skill, the recruits are given practical tests where they must complete the evolution in a set manner. The resulting evaluation is based upon the training captain's observation of the recruit's performance of each required skill. *DSOF*, ¶ 39.

During training, the captains and mentors documented recruit performance in a daily log. These logs are called "dailies," and contain comments and ratings by each training captain or a mentor conducting a particular drill and were turned in to the lead captain. *DSOF*, ¶¶ 48-50, Ex. 16. The dailies were used by the lead training captain and the training captains to record the progress of the recruits in learning the skills necessary to be a firefighter. The captain teaching a specific skill marked a bow reflecting each recruit's performance as "below standard," "improving," "meets standard," or "exceeds standard." The form also provides for comments. *DSOF*, ¶ 51. The dailies were used to evaluate recruits, to prepare the One Word evaluations, and in preparing for the routine counseling sessions that were given to the recruits. *DSOF*, ¶ 52.

Each recruit is also given periodic written evaluations of their progress. Two captains, Captain Justen and one of the other training captains, prepared written counseling for each recruit based upon the daily records, the One Word evaluations, Captain Justen's weekly log and discussions with the other training captains. Each routine counseling was individually discussed with each recruit, informing them of the areas where they were doing well or need improvement. *DSOF*, ¶ 41. In addition to the routine counseling, training staff could give a recruit a special counseling for "inappropriate attitude" or "failure to maintain competency standards" as part of a stepped disciplinary process. *DSOF*, ¶ 42.

Under this system, Kent was given a routine counseling on August 6, 2007, in which Captain Justen noted her academic strength, but stated that she needed to improve her skills

4

and physical fitness. The counseling also provides several recommendations for improvement:

> Skills – you continue to struggle to learn and attain proficiency on new skills. Your academic knowledge is good, but you struggle to put that knowledge to practical use. Study your competencies, review the demos that are presented in class and use visualization techniques to "practice" skills while away from the academy. Practice tying knots at home with your sacred rope. Physical fitness – continue to push yourself at PT. The rigors of firefighting demand that you maintain a high level of physical fitness. Continue to keep a positive attitude even when being scrutinized or criticized. The goal of the program [is] to make you succeed, but that desire to succeed must come from you.

*DSOF*, Ex. 14.

Kent's next routine counseling was prepared by Captain Justen on September 10, 2007. Academics were again noted as an area of strength, but skills and physical fitness were identified as "areas in need of improvement." Justen noted that some of Kent's struggles with skills were related to her lack of strength and endurance. Addressing Kent's skills, Justen stated that "[y]our skills have improved, but you still struggle with new skills. Continue to study your practical guides as well as notes from demos. We will transition from learning to applying skills soon and this is where deficiencies come out." *Id*.

Kent's final routine counseling is dated October 15, 2007. Academics is again her strength and skills and physical fitness her areas in need of improvement. Justen's recommendations for skills improvement were as follows:

> Skills – You have passed all your practical exams. However, you continue to struggle with your skills. Your application of knowledge, ability to perform evolutions and adapt to new situations is poor. This is the time in the academy when you must be able to perform basic skills and learn apply [sic] them to new situations. You **must** determine a way that you can learn the skills in order to be successful in this program and in this career. Study your competencies, look at equipment, use your classmates, visualize evolutions on your days off, and figure out how things work. Do what ever it takes to use the knowledge you have and apply it to the job that is required.

*Id*.

In addition to the routine counseling, Kent also received a "Special Counseling for Failure to Maintain Competency Standards" from Captain Justen on September 18, 2007. In the memorandum, Justen states, "Over the past several weeks you have demonstrated that you have difficulty retaining skills and information presented to you throughout the academy." He proceeds to describe an incident where Kent failed to properly connect a fire hose to a hydrant, and troubles in operating a fire engine. Justen notes that on September 11, 2007, Kent was unable to start an engine because she was not familiar with the particular engine, and then states that:

> Captain Perry advised you at that time that after 10 weeks you should be able to operate the engines and that you should review the operating procedures. With trouble placing the engine in and out of pump gear and difficulty moving apparatus, your actions have indicated that you have not taken the steps necessary to improve your performance in these areas. Apparatus was taught in the first week and you have had the opportunity to learn the apparatus since then. You also continue to have trouble with ropes and knots during tower line up and in practical application. We have been tying knots since week 1.

*DSOF*, Ex. 15. Justen then cites the Recruit Training Protocol that was violated and states that "You know that your weakness is with your skills, as we have had several informal counseling sessions and have discussed this in routine counseling." *Id.*, p. 2.

Kent was terminated from the academy in October 2007 based on the recommendation of Chief Critchley to Chief Newburn. *DSOF*, ¶ 114. In making the recommendation to Chief Newburn, Chief Critchley relied upon his own familiarity with Kent's performance and on the recommendation in a memorandum prepared by Lead Training Captain Justen. *DSOF*, ¶ 115. In the memorandum, which is dated October 16, 2007, Captain Justen described several events in support of his recommendation that Kent be terminated "for significant safety violations." *DSOF*, Ex. 24, p. 1. The first was an auto extrication drill during which Kent, "[w]hile using the Amkus cutter to make cuts around the lower hinge of a vehicle, . . . got her left had caught between the tool[']s throttle and the glove box." *Id*. The second involved a drill during which Kent improperly stepped off a latter that resulted in her "hanging by her hands from the wall with one foot partially on the ladder," and

6

eventually jumping down to the roof, potentially causing an impact load that could result in the collapse of the roof. *Id.*, p. 2. The third incident occurred when Kent stepped behind the tailboard before an engine had been placed in neutral and the parking brake set. *Id.* Captain Justen then indicates that the cited safety issues "are in direct violation of Recruit Training Protocols, Section I, subsection 3, Paragraph j, which states: "*Risk of injury, to self or others, through unsafe acts will be grounds for termination.*" *Id.*, p. 3. He then concludes the memorandum by stating that Kent was given a special counseling on September 18, 2007 for "Failure to Maintain Competency Standards." *Id.* He then describes how Kent struggled with skills training, using two examples, and then notes that Kent "would have been placed on Job-In-Jeopardy [status] for failure to maintain competency standards, if the significant safety violations had not been observed." *Id.*

## II. Legal Standard

The purpose of summary judgment is to avoid unnecessary trials where the moving party can establish that there is no dispute over the relevant material facts. *Northwest Motorcycle Ass'n v. U.S. Dep't of Agriculture*, 18 F.3d 1468, 1471 (9th Cir.1994). Rule 56(a) mandates summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In evaluating a motion for summary judgement, all justifiable inferences must be viewed "in the light most favorable to the non-moving party." *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir.2001).

Initially, the moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. The non-moving party must then "go beyond the pleadings and identify facts which show a genuine issue for trial." *Id.* To avoid summary judgement, the opposition "must cite to the record in support of the allegations made in the pleadings to

1 demonstrate that a genuine controversy requiring adjudication by a trier of fact exists."
2 *Taybron v. City of San Francisco*, 341 F.3d 957, 960 (9th Cir.2003).

**III. Discussion**

    **A. Gender Discrimination - Hostile Work Environment**

Although the Civil Rights Act of 1964 does not explicitly include claims based on a hostile work environment, Title VII of the Act has been interpreted to include such claims. *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993). Hostile work environment claims "are different in kind from discrete acts" and "[t]heir very nature involves repeated conduct." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). Thus, by its very nature, hostile work environment harassment "cannot be said to occur on any particular day." *Id*. To survive summary judgment, Kent must show that "(1) she was subjected to verbal or physical conduct of a sexual nature; (2) the conduct was unwelcome: and (3) the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment." *Porter v. Cal. Dept. Corr.,* 419 F.3d 885, 892 (9th Cir.2005) (citing *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir.2004)). It is not required that the harassing conduct be motivated by sexual desire, and an inference of discrimination can be established by showing "general hostility to the presence of women in the workplace." *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1110 (9th Cir.2000) (citations omitted).

A review of the authority addressing these claims makes clear just how severe and pervasive the hostility must be. As the Supreme Court has recognized in the context of hostile work environment claims, Title VII is not intended to serve as "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80-81 (1998). This statement is certainly borne out in the cases. In *Pannelli v. First Am. Title Ins. Co.*, 704 F.Supp.2d 1016 (D.Nev.2010), the court granted summary judgment in favor of the defendant where, over a two year period, its managers referred to women as "bitches," would growl at women and tell them they look good or comment "I'd do her," and

suggested going into a brothel to eat the "up-the-butt chicken special" and to see if the wallpaper was "scratch and sniff." *Id*. at 1020. In *Kortan v. California Youth Authority*, 217 F.3d 1104 (9th Cir.2000), the Ninth Circuit affirmed summary judgment in favor of the defendant where the plaintiff's supervisor had referred to other females in the office as "regina," "madonna," or "castrating bitch," and referred to women generally as "bitches" and "histrionics." *Id.* at 1106-07. The court concluded that the conduct in question was not frequent, severe or abusive enough to support the plaintiff's claim of a hostile work environment. *Id*.

Although Kent raises a claim for hostile work environment in her complaint, *Complaint*, ¶ 7, she has presented no argument and little factual support for the claim in her response to the City's motion for summary judgment. In her Statement of Facts, Kent offers two paragraphs, both attributed to Recruit Carrie Ferrara, that suggest hostility at the Academy. *PSOF*, ¶¶ 14 & 15. Ferrara testified that mentors Marcy Zbojniewicz and Charles Cohen were "playful" and "buddy-buddy" with the male recruits and more serious toward the females. *Id*. In her response, Kent does not argue that this alleged difference in treatment created a hostile work environment. However, even if she had, the atmosphere as described come nowhere near the behavior described in *Pannelli* and *Kortan* and simply was not sufficiently severe or pervasive to support a claim for hostile work environment.

### B. Gender Discrimination - Disparate Treatment

Title VII stated that it is an unlawful employment practice to "discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2. In the absence of direct evidence of discrimination, Title VII claims are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "When responding to a summary judgment motion . . . [the plaintiff] may proceed using the *McDonnell Douglas* framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not

motivated [the employer]." *Metoyer v. Chassman*, 504 F.3d 919, 931 (9th Cir.2001). Here, Kent has elected to proceed pursuant to *McDonnell Douglas*. *See Response*, pp7-8. Under this framework, a plaintiff must first establish a prima facie case of discrimination. *Coghlan v. Am. Seafoods Co. LLC,* 413 F.3d 1090, 1093-94 (9th Cir.2005). To establish a prima facie case of disparate treatment discrimination, the plaintiff must show that (1) she belongs to a class of persons protected by Title VII; (2) that she performed her job satisfactorily; (3) she suffered an adverse employment action; and (4) that her employer treated similarly situated employees outside her protected class more favorably. *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir.2008) (citing *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1126 (9th Cir.2000)). If the plaintiff successfully makes out a prima facie case, "the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. If the employer satisfies this burden, the burden returns to the plaintiff to show that the employer's justification is a mere pretext for discrimination. *Id.* at 804.

The plaintiff can raise a genuine issue of material fact as to whether the employer's justification is pretextual either "(1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Chuang*, 225 F.3d at 1127. When a plaintiff offers only indirect evidence that the employer's stated motives were pretextual, the evidence must be both specific and substantial to survive summary judgment. *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1066 (9th Cir.2003). And, "[w]hile the burden of production may shift, the 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 659 (9th Cir.2003).

    **1.**    **Prima Facie Case**

The City contends that Kent cannot make out a prima facie case because her job performance was not satisfactory and because she fails to identify a similarly situated employee from outside her protected class who was treated more favorably. "The requisite degree of proof necessary to establish a prima facie case for Title VII . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir.2002) (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir.1994). For the purposes of this motion, the Court will assume *arguendo* that Kent has met the low burden of satisfying her prima facie case. As discussed below, her job performance and arguments that another recruit was treated more favorably are crucial to both the City's proffered legitimate reasons for termination and to Kent's argument that those reasons are mere pretext.

## 2. Legitimate Non-Discriminatory Reason for Termination

To satisfy its burden of production of a legitimate non-discriminatory reason for the termination, the City "must clearly set forth, through the production of admissible evidence, reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *Raad v. Fairbanks North Star Borough Sch. Dist.*, 323 F.3d 1185, 1193 (9th Cir.2003) (citations omitted).

As a threshold argument, the City argues that Kent "simply could not do the job of a firefighter." *Motion*, p. 8. Although she was successful academically, the observations of the training captains led them to conclude that she could not learn and maintain the necessary skills. The City cites several examples in support of its conclusion. Kent was unable to properly remove a fire hose from the engine. *DSOF*, ¶¶ 84 & 91. She could not advance, align and connect the parts of the fire hose and connect the hose to the hydrant correctly. *DSOF*, ¶ 45-46, 82, 91. At various times, Kent had trouble operating a chainsaw, tying knots and using ladders. *DSOF*, ¶ 70-92.

The City also asserts that the series of safety related incidents just prior to Kent's termination demonstrated her inability to maintain competent skills and placed Kent and

others in serious risk of danger or death. These events, which are set forth in Captain Justen's memorandum recommending termination, are described as "significant safety violations" and include Kent's difficulties with the Amkus cutter, improperly stepping off a ladder and eventually jumping down to the roof, and stepping behind the tailboard of a fire engine before it had been placed in neutral and the parking brake set. Captain Justen then stated that Kent's actions were a direct violation of training protocols. The memorandum also states that Kent "would have been placed on Job-In-Jeopardy [status] for failure to maintain competency standards, if the significant safety violations had not been observed." These reasons for termination, if they are to be believed, are legitimate and non-discriminatory. The burden thus returns to Kent to show that the reasons cited are mere pretext to hide unlawful discrimination.

### 3. **Pretext**

To satisfy her burden of establishing pretext, Kent must do more than show that the City's proffered reasons are false. "Rather, courts only require that an employer honestly believe [ ] its reason for its actions, even if its reason is 'foolish or trivial or even baseless.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir.2002). A plaintiff must show that "either . . . a discriminatory reason more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence." *Id.* (citation omitted). In its entirety, Kent's argument in support of finding TFD's proffered reasons to be pretextual is as follows:

> With regard to pretext, the most telling evidence is that the Fire Department completely ignored its own Guidelines for disciplinary action in acting to terminate Kent's employment. For all the claims that Kent engaged in "significant safety violations," she did not cause injury to herself or others, or damage to property, and therefore immediate termination was not warranted under the Guidelines. In addition the Department did not follow the procedural steps required when there is an alleged failure to maintain competency standards. Contrary to the Guidelines, Termination is only to be recommended "when all other corrective action methods have been exhausted." The Department revealed the pretextual nature of its alleged reason for termination when it failed to abide by its own policies.

12

*Response*, p. 9. The guidelines to which Kent refers are found in Section III of the Tucson Fire Academy Guidelines for Recruit Disciplinary Action and describe situations supporting the placement of a recruit in Job-in-Jeopardy status for safety violations:

1. Significant and/or flagrant safety violations that cause injury to oneself or to others are ground for immediate termination of employment.

2. Significant and/or flagrant safety violations that do not cause injury to oneself or others, but cause damage to City or personal property, are grounds for immediate termination of employment.

3. Significant and/or flagrant safety violations that do not cause injury to oneself or others, and do not cause damage to City or personal property, will result in the violator being placed on "Job-in-Jeopardy Status for a Safety Violation".

4. The "Job-in-Jeopardy Status for a Safety Violation" will remain in effect until the completion of the Fire Academy, or until such time as the individual is removed from this status due to the demonstration of a safety conscious attitude, as determined by the Training Chief and Training Captains.

5. A second significant and/or flagrant violation of a safety rule while in "job-in Jeopardy Status for a Safety Violation" will result in termination of employment.

6. The items listed above are not all inclusive. Each situation must be evaluated individually to insure uniform enforcement.

*PSOF*, Ex.4, p. 5. As Kent points out, under these guidelines, "[t]ermination of employment is the last measure of disciplinary action, and should only be recommended when all other corrective action methods have been exhausted." *Id.*, p. 12.

Kent contends that these provisions of the Guidelines were not followed and cites several cases for the proposition that this failure is evidence of pretext. While she is correct that such deviation may evidence pretext, in each of the cited cases deviation from standard procedures was not the only evidence of pretext, but was coupled with evidence that the plaintiff was qualified and that the defendant acted with discriminatory animus. In *Brennan v. GTE Government Systems Corp.*, 150 F.3d 21 (1st Cir.1998), an age discrimination case,

13

the plaintiff presented evidence that he was a competent employee and that his employer favored younger employees. In *Stern v. Trustees of Columbia University*, 131 F.3d 305 (2nd Cir.1997), a national origin discrimination case, the plaintiff presented evidence that, *inter alia*, he had superior qualifications and that the defendant was seeking to hire a person of Hispanic descent. In *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210 (10th Cir.2002), a race and age discrimination case, the court reversed a judgment in favor of the defendant after it found "disturbing procedural irregularities" coupled with inconsistencies and contradictions in the plaintiff's job evaluations. In *Davis v. Wisconsin Dept. Of Corrections*, 445 F.3d 971 (7th Cir.2006), a race discrimination case, the African-American plaintiff supplemented his evidence of procedural irregularities with evidence that similarly situated white employees were treated more favorably.

Two cases cited by Kent illustrate the shortcomings of her argument. In *Norville v. Staten Island University Hospital*, 196 F.3d 89 (2nd Cir.1999), the court affirmed the district court's ruling in favor of the defendant because the plaintiff "produced no evidence that the hospital's reasons [for firing the plaintiff], even if pretextual, served as a pretext for age discrimination." *Id*. at 98 (citation omitted). Likewise, in *Lattimore v. Polaroid Corp.*, 99 F.3d 456 (1st Cir.1996), the court found that the plaintiff had offered evidence that the defendant had deviated from its established policies, but nevertheless reversed the trial court's ruling in favor of the plaintiff on his discrimination claim because no substantial evidence of discriminatory intent was offered. The situation here is similar. Even if it is assumed that TFD rigorously followed the cited guidelines (which has not been established), Kent offers no evidence that would allow a reasonable jury to conclude that the pretext served to disguise gender discrimination.

In fact, the only evidence that can be construed as supporting her argument appears elsewhere in the response. In her factual recitation, she asserts that, "as a female, [she] was treated differently from certain male recruits." *Response*, p. 4. A showing that TFD treated similarly situated employees outside Kent's protected class more favorably would be

14

| | |
|---|---|
| 1 | probative of pretext. *Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir.2003). In this case, appropriate comparators would be other employees outside Kent's protected class "who have dealt with the same supervisor, have been subject to the same standards, and engage in the same conduct without any mitigating or distinguishing circumstances." *Clark v. Runyon*, 218 F.3d 915, 918 (8th Cir.2000). In this case, a proper comparator would be (1) a male recruit, (2) whose skills were consistently identified as "poor," (3) who had committed several safety violations, and (4) was not terminated. Kent simply offers too little in support of her contention that the male recruits, whom she identifies as Recruit Wallace and Recruit Mason, were similarly situated. Rather, she states that Wallace failed a skills examination for a third time and should have been terminated, and that Mason was the driver in the incident described in Justen's termination memorandum where Kent walked behind a fire engine. This is simply not enough to allow a fact-finder to conclude that these recruits and Kent were similarly situated. Although Wallace and Mason presumably are males, there is no evidence of their skills ratings or involvement in multiple safety violations. |

Kent also has not established that deviation from the guidelines was uncommon. Suggesting that the guidelines are flexible, TFD reiterates point six of the cited guidelines which provides that the guidelines "are not all inclusive," and that each situation is to be evaluated individually, and asserts that the guidelines are just that, guidelines, and are not mandatory. In fact, in the reply, TFD notes that prior to Kent's termination, two other recruits were dismissed for safety violations without first being placed on job in jeopardy status. *Reply*, p. 3.

As Kent fails to raise a genuine issue of material fact in support of her claim of disparate treatment, the City is entitled to summary judgment on her gender discrimination claims under Title VII of the Civil Rights Act of 1964.

. . .

. . .

. . .

15

**IV.     Recommendation**

Based on the foregoing, the Magistrate Judge **RECOMMENDS** that the District Court, after its independent review, **GRANT** Defendant's Motion for Summary Judgement (Doc. 47).

This Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment.

However, the parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the District Court. *See* 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure. Thereafter, the parties have fourteen (14) days within which to file a response to the objections. If any objections are filed, this action should be designated case number: **CV 09-0280-TUC-FRZ**. Failure to timely file objections to any factual or legal determination of the Magistrate Judge may be considered a waiver of a party's right to *de novo* consideration of the issues. *See United States v. Reyna-Tapia* 328 F.3d 1114, 1121 (9th Cir. 2003) (*en banc*).

DATED this 26th day of September, 2011.

*Jacqueline Marshall*
Jacqueline Marshall
United States Magistrate Judge